May it please the Court, Roger Kaplan for Plaintiff Appellant, Aspex Eyewear, Inc. And, Your Honor, I'll reserve two minutes for rebuttal. Okay. What I'd like to do is address the three principal legal issues that we contend the Court below applied the wrong legal standard. And let me outline those three legal issues. The first is with respect to the Hobbs Act, the distinction between hard bargaining and the wrongful use of economic fear. The next issue is defendant's principal defense in this case, which is they have an absolute right to refuse to deal with respect to someone that's suing them, and they're protected by that doctrine as opposed to repeated threats to refuse to deal. And, again, the district court simply applied the wrong legal standard under those controlling cases. And the third issue that I'd like to address is the distinction between what defendants contend is an at-will contract, the at-will contract in this case, versus our contention that it was not at-will, that the circumstances indicate it was not at-will, and it was subject to the gatekeeper doctrine, and that with respect to both the at-will doctrine and the gatekeeper doctrine, an incorrect legal standard was applied. Let me go back to the first issue, which is hard bargaining versus the wrongful use of economic fear. There is a body of case law which says that even in economic negotiations, if it is the – and the statute says the wrongful use of economic fear. What is the wrongful use of economic fear? There are really two prongs to that test. The first is, which we meet, is if it's inherently wrongful. And what is inherently wrongful? Inherently wrongful, based upon cases such as U.S. v. Brecht and U.S. v. Vigil, is the wrongful use or the abuse of a position of trust, that you are in a position of trust, you're supposed to exercise your discretion. Are you claiming that these people have a fiduciary obligation? These people do have a fiduciary obligation. On what legal basis? Well, Your Honor, they admit that they are the administrators for Medicare plans, for Medicaid plans, for governmental plans, state plans. That's not the beneficiaries of those plans. We're talking about you. You supply eyewear products. Oh, no. We're not suggesting they're fiduciary to us. Okay. Well, isn't that what this case is about? Well, but just like in Brecht, we're the victim of the economic fear. I understand that's your position. Just as in Brecht, the purchasing agent was the agent for Westinghouse, did not owe a fiduciary duty to the victim, but owed a fiduciary duty to his employer, somebody else, and in violation of that fiduciary duty, sought to exercise its discretion for his own benefit. The same thing occurred in U.S. v. Vigil. In U.S. v. Vigil, it was the attorney general who was seeking, who had a fiduciary duty to the state, and abused that fiduciary duty. That was a personal relationship situation, was it not? It was a personal. Rather sordid personal. Well, the point, though, and the legal issue is that the party exercising or imposing economic fear was in a position of trust to somebody else. With respect, counsel, I need you to help me on this, because I practiced transactions law for 37 years, and I think I understand contracts and competition and antitrust actions and the like, and I'm having real difficulty understanding where there's a fiduciary relationship between you and the defendants in this case. I understand their role with the ---- There is not. So if there's no fiduciary relationship, then where do you get this relationship of trust concept? The relationship of the abuse, it's not a relationship of trust. You said that, did you not? No. What I said was that the defendant is in a position of trust vis-a-vis the beneficiaries of the plan. They are required to exercise their discretion. Okay. Now, if they exercise that discretion to benefit solely themselves, as opposed to the beneficiaries of the plan or the parties that set up the plan, such as the State government ---- You're saying you're a third-party beneficiary. It's not a third ---- It's not a third-party beneficiary. What it is is that the use of the ---- and abuse of that position of trust makes it inherently wrongful, just as the purchasing agent in Brecht sought a kickback for himself, abusing his position vis-a-vis his employer, sought the kickback from the defendant, just as in Vigil the purchasing ---- the attorney general abused his position of trust vis-a-vis the State in making a demand on the victim. In this case, the demand on the victim, meaning us, was to give up our intellectual property rights in response to a threat, the threat being inherently wrongful because it violated a position of trust. But again, are you not confusing the difference between a relationship of trust that the defendant's appellees may have had with Medicare, Medi-Cal, all that sort of thing, vis-a-vis you? No. There's no relationship of trust in your company, right? The Hobbs Act does not require the relationship of trust between the victim and the defendant. What makes it ---- what makes the threat, the coercion, inherently wrongful is that it is a violation of the trust to a third party. It doesn't matter that the victim is not. So by your lights, every contracting party ---- well, for example, if there's a hospital and the hospital buys gauze from somebody and there's a Medi-Cal patient in the hospital for whom that gauze may be used, if the hospital terminates the services of the gauze provider, you say there's a relationship of trust and that the gauze provider is a victim. Is that your ---- Your Honor, by definition, if the purchasing agent in the hospital tells the vendor that in order to continue supplying the hospital, you must pay me personally $1,000, then that purchasing agent is violating a position of trust vis-a-vis the hospital, the employer. And that is ipso facto. And that's what happens here, Your Honor, that there is a position of trust between the ---- Moving on to kickback. BSP is seeking a kickback. They're seeking our relinquishment of our intellectual rights to them. That's not a kickback. Well, it's similar. Let me, Your Honor, if I may, there is another reason why this is not ---- this is not hard bargaining, but this is the extortionate use of economic fear. You're very creative. Excuse me? You're very creative. Your Honor, in brokerage concepts, the Third Circuit, and in a number of cases following the Third Circuit, define the distinction between, in a commercial setting, in commercial negotiations, the distinction between hard bargaining and the wrongful use of economic fear. And what the Third Circuit said in a number of cases have followed since then, that it is the wrongful use of economic fear when the extortionate demand is unrelated to or extraneous to the subject matter of the negotiations. And that's at page 140, F3rd, at 522 to 526. But our case of Sosa v. Direct TV Inc. says that the conduct can't be wrongful if the threat to do something is something that someone has a legal right to do. That's correct. And the distinction ---- They pretend they have a legal right to do it. All right. Well, then let me ---- first of all, if it is extraneous to the negotiations, and I'll get to the legal right in a minute, if it is under brokerage concepts, if the demand is extraneous, unrelated to the negotiations, it goes from hard bargaining to an extortionate threat. In our case, the subject matter of the negotiations was the settlement of the patent cases, allegedly. And it was patent cases between Aspects and Altair and Marchand. Along comes either Altair and Marchand or VSP and imposes this extraneous condition having nothing to do with the subject matter of those negotiations, saying you will lose your in-network status unless you settle these cases under a certain condition. Isn't there a case law that suggests that someone has the right to terminate an at-will contract? And I know you're going to argue about the at-will point. Yes. But if ---- basically, if somebody keeps suing you, you don't have to keep doing business. Let me get to that point, because that is, Your Honor, the principal defense in this case, that they have the right to stop dealing with a party that's suing them. And I see that as their key defense in this case. And they rely principally on three cases, Marin Tug v. Westport, Intergraph v. Intel, and Scripps v. Superior Court. And two of those cases are Ninth Circuit opinions. We like those. I know you do. And I think it's good law, but they don't apply in this case for the following reason. In each of those cases, when the defendant was sued, the defendant simply stopped dealing. There was not a pattern of threatening to stop dealing in order to extract an extraneous concession. Just like ---- and let me use an example, Your Honor. We're all familiar in the antitrust context with the Colgate Doctrine. 1919, the Supreme Court held that if you establish a policy not to deal with discounters, and you can simply refuse to deal with them, and you have not violated the law. However, since 1919, the Supreme Court, and this Court as well as every circuit court around the country, has said that if you go beyond the simple refusal to deal and engage in a pattern of threats to the discounter, that I will refuse to deal with you unless you stop discounting. You're now no longer exercising a right not to refuse to deal. You've entered into illegal conduct. What happens? Would they have the flip side of that? They allege that you continually sue people. That's your pattern of conduct. Would they have a right claiming that you were threatening them and that they would have a copyright? No. Your Honor, we have a statutory ---- we have a valid patent. The patent has never been declared invalid. In fact, we ---- They're challenging it, are they not? Well, Your Honor, they've challenged it, but they haven't prevailed. What percentage of patents that are challenged in court survived? Do you have any idea? I have no idea, but our ---- About 10 percent or less. Our patents have been alleged in well over 40 cases, have never been declared invalid. I guess my ---- what I'm trying to understand is, isn't it sauce for the goose? No, because we haven't threatened to bring suit in order to extract an extraneous promise. We've brought suit. And what we've done is exercise our statutory right. If you think we have an invalid claim, you defend the claim on the merits. And in fact, Your Honor, we recently prevailed on an infringement issue against Voltaire. And that case is going to trial. Now ---- You said you wanted to reserve two minutes. Do you want to do that? Yes. Yes, I do, Your Honor. Okay. Why don't we hear them from the other side and then ---- I know you have a lot to say, but ---- Okay. And I did want to get to the at-will issue as well. Of course. If I can rebuttal, you can do that. Your Honor, good morning. I'm Scott Hanson. Along with Laura Brenner, I represent VSP here this morning. If I could begin with two, really my two takeaway points. Number one has to do with the facts of the record. And number two has to do with what we heard just a moment ago about the law. It's clear if you look at the transcript that the trial court judge came to the hearing well versed in the facts because he spent an hour and a half asking, interrogating, primarily appellant's counsel, about facts that were or were not in the record concerning the critical elements of each of the causes of action that were before the Court that day. And repeatedly, throughout that questioning period, the trial court commented about the lack of evidence. At times he referred to that lack of evidence as speculation. Other times he said it's a hypothesis or a theory without facts. And at the end of an hour and a half and after he had issued his oral decision from the bench, he went on to say that we're asking ---- The U.S. Supreme Court has spoken about that recently more than once. It's an extraordinary remedy. And to have to be entitled to the remedy of a preliminary injunction, you need to have a lot more evidence than they presented to the Court in that hearing. And the ---- So your takeaway for us on that is that, in addition to the legal points which you will argue, that we should be mindful of the fact that part of the reason why the trial court denied the motion for summary judgment is because there was simply insufficient evidence to flush out causes of action, even if the causes of action were valid, right? Correct. On every single point. And on appeal, what you're seeing argued here is the same version of the facts they presented to the trial court. And as Your Honor wrote in the Creative Living case, that's not good enough. You have to come to court and say that the facts were found in clear error. So we've got a factual record. It really isn't challenged, except for when they get to this Court, they completely dispense ---- they continue to spin the same yarns they spun to the trial court about what the record said and didn't say. And what ---- clear error is the standard of review for us. Is that correct? Yes. It's an abuse of discretion standard. First question is whether or not the judge applied the correct law. And if the judge did apply the correct law, it's essentially, was it where his findings unreasonable, illogical, and the like. Correct. Now, what they're saying they're doing here today is they're arguing the law because they want to avoid that standard. But what they're really doing is they're saying, take the facts as we want you to see them, apply the law to those facts, not to the facts as the judge saw them, and we think that the judge committed clear error in his conclusions about how the law applied. But that isn't a proper standard of review. So my second takeaway message is that the judge got the facts right, and because he got the facts right, his conclusions about how the law applied to those facts was correct. And there really isn't a serious challenge about it. What they've had to do in order to make the causes of action fit this paltry record is they've had to extend their legal theories beyond where no court has been willing to go before, whether it's the Hobbs Act, whether it's the antitrust law, the incipient violation, or the argument that I suspect we're going to hear in a minute about the contract. All of those are contrary to the factual record that the district court found. If we concur in your position on this point, they'll have an opportunity, will they not, to flesh out the factual record at trial, right? Certainly. Certainly. And let me anticipate the argument on the contract, since I'm not going to get a chance to respond to it. What he will say is that there's a doctrine of fair procedure, and that doctrine of fair procedure somehow amended the contract to transform an at-will contract from a – to a – to a contract requiring good cause and notice. That's, as I understand, the gist of their argument. Tort law doesn't amend contracts. For example, let's think about defamation for a second. Let's say you and I happen to be in a contractual relationship, and I defamed you, or you allege I defamed you. You don't sue me for – for breaching the implied covenant of no defamation. You sue me for the tort of defamation. So the – the argument that he's going to make, I presume, about the tort of fair procedure amending the contract is simply not true. The court in Potvin, for example, dealt with the reverse of that. Other courts have dealt with the exact argument he's making. Contract law can't trump tort law, and tort doesn't amend the contract. The other point I would make, but he didn't really raise it very much, is the lack of evidence of foreclosure. All of the claims, the Hobbs Act, rather the – the claim of fair procedure turns so much on their allegations that we have the ability to direct the market away from them, even though there's no evidence of that. And there was a lot of evidence in the record to the contrary to support the trial court. The average eye doctor participates in over 20 benefit plans. We're one of those benefit plans. We're not an insignificant benefit plan, but the average eye doctor has over 20. If you go to your own doctor, no doubt they have probably 20 or 30 plans. So as I understand it, you represent about 18% of the total optometric practice and 22% of the patients. Is that a fair characteristic from the characterization of the record? Fair. Of the channel of distribution represented by private eye care docs. And you've got the whole other channel of lens crafters and Wal-Mart and Costco. And we don't cover – we don't cover that. It's all out of network. And as I understand it, the appellants in this case remain – they're off plan, but they're not excluded. They're just not as part of the – what do you call it? The in plan or – Absolutely. And it's – that's another thing that made their declaration so speculative because they were based on two false premises. One is they're being excluded from participating at all and that they're being delisted. Neither of those things are true. Is there anything in the record that indicated how much business they did with your company as an outsourced person? They offered no evidence of that. Okay. The closest thing you'll get is in Bernard Pedesel's declaration where he says, I don't know how many of the doctors we do business with actually accept VSP insurance as one of their 20 or so plans. But he estimates – he says, I think, I believe it's probably a majority. That's the closest he ever gets. But here's an interest I didn't realize as to why I was looking at it on a plane coming over here. You get more time when you're looking on a thinking plane. Fortunately, we do get a lot of time on planes, yeah. What that means – remember, he says 70% of our business is in the independent eye care channel. 30% is Walmart, Kmart, you know, and all that. He's saying, I think that of that 70%, only about half of the doctors even accept VSP insurance. So it follows that as to that other half, that other 35%, he's out of network anyway. That means Aspex is out of network, the 30% on the Walmart side and the 30 to 35% on the independent doctor side. It means they've managed to grow their business as they've bragged, even though 65% of their business has been out of network to begin with. So unless you have specific questions, I won't take any more of your time. I think not. Thank you for your argument. I'll give Mr. Kaplan an opportunity for rebuttal. Thank you, Your Honor. Let me just go directly to the contract issue and the at-will relationship that counts. That's California law, is it not, the at-will concept? It absolutely is, Your Honor. What is your response, Mr. Kaplan, to Mr. Hansen's pretty much hornbook statement that you don't – tort law doesn't trump contract law and vice versa? Well, let me first say that, first of all, it's an incorrect statement of law because under the fair procedure doctrine, the fair procedure doctrine does in fact temper an at-will relationship. And if you do demonstrate that the doctrine applies because the defendant is a gatekeeper, it does eliminate the at-will relationship. What about the concept – and I don't mean to rush you on this, but I want to address this – that he makes the point and, of course, the record, as at least alleged in the – what we have before us, the trial court, found that there was simply insufficient evidence to back up the point that you're making. Now, what's your response to that? Well, the point that I'm making is really twofold, Your Honor. Let me make the second point first because I think you're more interested in that, on the gatekeeper – on the gatekeeper issue. The evidence – As long as it's not a Watergate, we're okay with it. It's not Watergate. Okay. Okay. The evidence on the gatekeeper issue and that a VSP is in fact a gatekeeper under established – under established California law is the following, that in its Knox-King filing in 2008, VSP stated affirmably to the State of New Jersey that well over half of all eye doctors are in network and that its private practice optometrists and ophthalmologists are, quote, significantly dependent on VSP for their practice. Secondly, they say that by contracting with the large majority of private practice optometrists and ophthalmologists, they in fact enable the continued viability of the entire independent vision care delivery system. On top of that, Your Honor, is the concession that even if you believe their percentage, which of all optometrists, 22 percent of their revenue comes from VSP. You have to understand the meaning of that statistic. Can I ask you to wrap up? You're over time. I'm going to give you another minute to wrap up, so give me your best shot. Okay. Your Honor, under the case law, under Palm Medical, Potvin, and the other cases, we clearly satisfied that the VSP is a gatekeeper. If that's the case, then it's not at will and they have to demonstrate a substantive reason under the contract. Secondly, under Binder v. Aetna, which we've cited in our brief, you can have a termination only with cause provision, even though there is no specific durational term in the contract. The court committed clear legal error by saying that you need an express durational clause in order to avoid an at-will relationship. And the only other point, Your Honor, I'd like to make, if I may, it goes to the irreparable harm. Briefly, though. Very briefly. Irreparable harm under the law of this circuit, as well as the law in general, is if we can demonstrate that we will lose, prior to a trial on the merits, established customer relationships, and we will lose a significant portion of our independent reps, we've established irreparable harm. Can I just add to this point? I gather you concede that Winter now controls and that Winter overrides any Ninth Circuit precedents to the contrary about the continuum and the like. We do not concede that, Your Honor. And, in fact, what I think the case law is very clear, including the case law in this circuit, that ---- I'm delighted to hear anyone say that our case law is clear. Okay. I think it is. I've looked at the cases. If you look specifically at the Stormins case at 1127, all Stormins is saying is that the Supreme Court eliminated a lesser standard on irreparable harm. The same thing in American Trucking. And, Your Honor, even in the case that you wrote in Independent Living, you quoted the four-pronged test out of Winter. But there was no question in that case that the plaintiff had shown a likelihood of success. So there was no reason in that case or in American Trucking or in Stormins for the case ---- for the panels in those cases to address whether a lesser showing on the merits could be ---- could satisfy under what has been established case law in this circuit for the last 15 years. We thank both counsels. I have a general curiosity question. Yes, Your Honor. The insurance involved in this case is only for frames, right? No. The insurance involved in this case is for vision eye care. And it's not ---- frames is one part of it. A vision service plan provides eye vision insurance, meaning health care insurance for eyes, for 55 million beneficiaries, which is one in six Americans. But all they make is frames. No, no. All we make is frames. Yeah, you make is frames. One small part of their insurance program, a small part of their insurance program pays a significant portion of the cost of frames for their insureds if it's in-network, and they pay a much lesser portion of the cost of the frame if it's out-of-network. The difference, if I can give Your Honor an example, is on a frame of $130 in a typical plan, and we've included that in the record, the insured would pay approximately $25 on a $130 frame that's in-network, and BSP would pick up the remainder. If that frame was to be purchased out-of-network by the insured, the insured would pay $85 and vision network would pay only $45. So the difference to the insured is $25 out-of-pocket for in-network, $85 out-of-pocket. It's a very substantial difference, particularly given the statistics, which are undisputed, that 95 percent of their 55 million subscribers stay in-network. Okay. Any other questions, Your Honor? Thank you. Thank you, Your Honor. Both for your argument in the briefs. It's we don't get to see a lot of business cases in this circuit. Whenever we talk about frames in the Ninth Circuit, it usually has to do with people being framed, and that's in a different context. Well, we have a different context here. So we are adjourned for the day. Thank you.
judges: Todd, Hug, Smith M.